## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**LOCATION 24, LLC**

      **Plaintiff,**

                             **CASE NO.** 8:22-cv-00150

**DOCTORS SAME DAY SURGERY
CENTER, INC. and
HCA HOLDINGS, INC.**

      **Defendants.**

_____/

## COMPLAINT

Plaintiff, Location 24, LLC ("Plaintiff"), by and through its undersigned counsel, hereby files its Complaint against Defendants, Doctors Same Day Surgery Center, Inc. and HCA Holdings, Inc. (collectively, "HCA"), and alleges as follows:

## PRELIMINARY STATEMENT

This is an action for inappropriate restraints on trade and attempts to monopolize the orthopedic surgical services market in the Sarasota, Florida area through HCA's extensive anti-competitive conduct in violation of state and federal antitrust laws.    HCA implemented a fraudulent scheme that resulted in multiple breaches of contract and its fiduciary duties as General Partner to Plaintiff, the controlling of patients' choice of medical care, the manipulation of

17083112v1

salaries in the Sarasota orthopedic surgery market, and the reduction of the number of market participants in the Sarasota area orthopedic surgery market.

HCA's anti-competitive scheme involves its acquisition of the largest and most successful specialty surgical practices in a geographical area under the guise of a partnership. The sole purpose of the partnerships between HCA and the surgical practices is the co-ownership of ambulatory surgery centers (however, the land and buildings are wholly owned by HCA) to be utilized by the surgical practice. HCA, as landowner and leaseholder for these surgery centers, appoints itself as the General Partner of the partnership and manager of the surgery center with complete control over all decisions involving the partnership and surgery center.

After assuming total control of the partnership and surgery center, HCA then deliberately diminishes the quality, reputation, and capabilities of the surgical practice by controlling the surgical practice's procedure scheduling and availability for patients, surgery center employee salaries, and refuses to properly operate, maintain, improve, and modernize the surgery center as promised in the partnership and management agreements executed by HCA and the surgical practice.

While HCA is exerting this control over the surgery center, HCA allows its wholly owned hospitals to offer scheduling timeslots for surgical procedures the

surgery center is prohibited from offering, more competitive salaries for staff than the surgery center is allowed to offer, and ensures that HCA's hospitals are modernized and competitive with the ever-changing needs of the orthopedic surgical market while almost always refusing to conduct the most basic repairs at the surgery centers.   By doing this, HCA diverts the surgery centers' patients and best nurses and technicians to HCA's wholly owned hospitals, which are always located in close proximity to the surgery centers.

Finally, HCA ensures that every member of these surgical practices, should they wish to terminate the partnership with HCA, are discouraged to do so through HCA's economic threats of diminished partnership share value and onerous post-dissolution restrictive covenants.  The end result of this scheme is HCA achieving market power for a specific area of surgery in a location through its unlawful removal its largest and most successful competitors.   Damages, estimated to be well over $1,000,000.00, will be determined at trial.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337, in that this is a civil action arising under 15 U.S.C. §§ 1-2.

2.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a), in that the other claims brought herein form part of the same

case or controversy as those for which the Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

3.     Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), as this is the district in which one of the defendants resides and in which a substantial part of the events giving rise to the claims occurred.

## THE PARTIES

4.     Plaintiff, Location 24, LLC, is a limited liability company organized under the laws of the state of Florida with its principal place of business located at 6050 Cattleridge Boulevard, Sarasota, Florida.  Location 24, LLC is comprised of twelve of the eighteen doctors who are part of the Kennedy White Orthopedic Center.

5.     Established in 1975, Kennedy White Orthopedic Center has become one of the leading groups in Florida and the preeminent group in Sarasota County for orthopedic medical and surgical care.  As the largest orthopedic surgical practice in the Sarasota area, the Kennedy-White practice consists of eighteen doctors and twelve Physician Assistants and Nurse Practitioners. Kennedy White Orthopedic Center's principal place of business located at 6050 Cattleridge Boulevard, Sarasota, Florida.

6.     Defendant, HCA Holdings, Inc., is one of the world's largest for-profit hospital chains (including ownership of ambulatory surgery centers).  Per

HCA's website, HCA is one of the nation's leading provider of healthcare services and is made up of "locally managed facilities that include more than 180 hospitals and 2,000+ sites of care."[1] HCA operates in twenty-one states in the U.S. and the United Kingdom.  HCA Holdings, Inc. is incorporated in the State of Delaware with its principal place of business in Nashville, Tennessee.  HCA Holdings, Inc. may be served at CT Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, TN 37929-9710.

7.     Locally, HCA owns and operates four hospitals and four ambulatory surgery centers.  Statewide, HCA owns forty-six healthcare sites in Florida.

8.     HCA Holdings, Inc. is the ultimate parent company of Co-Defendant, Doctors Same Day Surgery Center, Inc., and was directly and materially involved through its agents, employees, officers, and directors in making the pertinent decisions and undertaking the actions detailed herein.

9.     Defendant, Doctors Same Day Surgery Center, Inc., who is wholly owned by Co-Defendant HCA Holdings, Inc., is a corporation organized under the laws of the state of Florida with its principal place of business in Dallas, Texas.  It may be served at 13355 Noel Road, Suite 650, Dallas, Texas 75240.

10.     In 1995, Plaintiff and HCA executed a Limited Partnership

---

[1] *See* HCA website: *https://hcahealthcare.com/about/our-history.dot*.

Agreement to create Doctors Same Day Surgery Center, Ltd. (hereinafter the "Partnership").

11.     On April 1, 2017, Plaintiff and HCA executed an Amendment and Restatement of Partnership Agreement (hereinafter the "ARPA"). **(See attached Exhibit "A")**

12.     The Partnership consists of HCA serving as the General Partner, and Plaintiff serving as the Limited Partner.

13.     Since the inception of the Partnership, HCA required that it hold 51% or more ownership units in the Partnership.   Through its majority ownership of these units, HCA has, at all times, completely controlled all decisions made by the Partnership.

14.     The Partnership owns and operates an ambulatory surgery center, Doctors Same Day Surgery Center (hereinafter the "Surgery Center"), located at 5741 Bee Ridge Road, Sarasota, Florida.

15.     The property which the Surgery Center is located, and the building housing the Surgery Center are owned by HCA and were acquired by HCA prior to the creation of the Partnership.

16.     Aside from its ownership in the Surgery Center, HCA owns Doctors Hospital of Sarasota (hereinafter the "Hospital"), which is located adjacent to the Surgery Center at 5731 Bee Ridge Road, Sarasota, Florida.

17.     The Surgery Center is located in a building connected to the Hospital and both facilities are within walking distance of one another.  The red arrows below identify the building that houses the Surgery Center and the red circle identifies the Hospital:



18.     HCA's three other surgery centers in the Sarasota area share similar proximities with HCA's wholly owned hospitals.

19.     The Hospital is a 155-bed private health care facility offering specialized care in various fields of medicine including but not limited to orthopedic care and surgery.

20.     The Hospital is in direct competition with the Surgery Center and both facilities are held out by HCA as separate entities.

## **FACTUAL ALLEGATIONS**

21.     This suit alleges the following causes of action against HCA:

- Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2);

- Violation of Fla. Stat. § 542.18, et. seq.;

- Breach of Contract;

- Breach of Fiduciary Duty;

- Tortious Interference with Advantageous Business Relationship; and

- Fraud.

22.     In Florida, HCA owns forty-six healthcare sites.



23.     In the Sarasota area, HCA owns and operates four hospitals and four ambulatory surgery centers:

- Gulf Coast Surgery Center in Bradenton (1);

- Blake Medical Center in Bradenton (2);

- Doctors Same Day Surgery Center in Sarasota (3);

- Doctors Hospital of Sarasota (4);

- Surgery Center at St. Andrews in Venice (5);

- Englewood Community Hospital (6);

- Fawcett Memorial Hospital in Englewood (7); and

- Gulf Pointe Surgery Center in Port Charlotte (8).



24.     HCA is the owner of the land and surgery center buildings for the

four ambulatory surgery centers described above.

25.     As shown above, HCA's four wholly owned hospitals are in close proximity to its four ambulatory surgery centers.

26.     HCA owns four of the eight private hospitals that are located in the Sarasota area. The remaining four private hospitals are owned by several other private companies and there is one county-owned hospital.

27.     As shown, HCA possesses an enormous market share in the hospital and ambulatory surgery center industry in the state of Florida, and specifically, the Sarasota area.

## I.     HCA's Scheme and Anti-Competitive Conduct

## a. HCA's Goal is to Unlawfully Control the Orthopedic Surgery Market Share in the Sarasota Area in Violation of Federal and State Law

28.     HCA's conduct, involving Plaintiff and other surgery centers, is the very definition of anti-competitive, and it evidences its specific intent to monopolize the orthopedic surgery market through this conduct.  HCA's actions include but are not limited to the following:

- Preventing patients from choosing the surgery center of their choice by intentionally restricting the Surgery Center's availability for surgical procedures.  HCA prohibits the Surgery Center from scheduling procedures at highly requested timeslots while allowing the Hospital to schedule procedures at these desired times in order to gain competitive

ground.  This has resulted in the diversion of patients from the Surgery Center to the Hospital;

- Preventing patients from choosing the surgery center of their choice by intentionally restricting the Surgery Center's capabilities for surgical procedures.  HCA failed to implement the Florida legislature's new 23-hour stay provision at the Surgery Center (HCA failed to implement the 23-hour stay in its other three surgery centers that it owns in the area as well).  The 23-hour stay gives ambulatory surgery centers and its surgeons the opportunity to perform higher-acuity procedures that have historically remained in hospital settings due to the required recovery time.

  By avoiding the implementation of the 23-hour stay, HCA hinders the Surgery Center's ability to remain competitive while the 23-hour stay has become the norm for ambulatory surgery centers.  HCA's failure to implement the 23-hour stay resulted in the diversion of patients from the Surgery Center to the Hospital and HCA's other wholly owned hospitals in the Sarasota area;

- Abuse of its market power by manipulating market salaries for nurses and staff for its own benefit.  HCA prevents the Surgery Center from hiring quality nurses and surgery techs by refusing to offer competitive salaries. HCA then permits the Hospital to offer more competitive compensation

packages in order to capture these essential employees for its own use at Plaintiff's expense;

- Deterring medical equipment and supply vendors from offering competitive pricing to Plaintiff. As HCA is a multi-national, billion-dollar company, it leverages the threat of taking away lucrative contracts from vendors in order to prevent Plaintiff from obtaining the same competitive pricing that is given to the Hospital;

- Diverting patients, doctors, and employees to the Hospital by its continued refusal maintain an efficient and modernized Surgery Center as required by contract;

- Refusing to allocate its portion of profits into the maintenance, modernization, and management of the Surgery Center in order to be on par with the Hospital; and

- As the General Partner of the Partnership, Manager of the Surgery Center, and leaseholder/landowner of the Surgery Center property, HCA refuses to advocate for the appropriate maintenance and modernization of the Surgery Center due to this glaring conflict of interest.

29.    HCA's scheme entails the formation of partnerships in ambulatory surgery centers with the largest and most successful orthopedic surgery practices in various locations in and around Sarasota County and the United States. After

forming partnerships with these surgical practices, HCA, in an attempt to divert business to its privately owned hospitals, methodically breaks down the efficiency and reputation of these practices as set forth above and as discussed further below.

30.    HCA's scheme is a premeditated plan that is implemented all over the country and over an extended period to reach its desired result.  The scheme inevitably breaks down HCA's partners' medical practices to ensure that the number of market participants has been reduced, enabling HCA to control the specific specialty surgical market in the region.

31.    HCA's involvement in litigation stemming from its fraudulent actions speaks for itself.  Among the litany of lawsuits HCA is involved in, HCA is currently being sued in an antitrust class-action lawsuit in North Carolina[2] alleging anti-competitive tactics involving monopolization and price-fixing.  The lawsuit alleges that HCA, as holder of more than 70% of inpatient services in seven North Carolina counties, acquired medical facilities from another company, cut costs and staff at the newly-acquired facility, and then diverted patients to HCA's flagship facility in an effort to consolidate hospitals and raise prices.  In 2003, HCA was fined $240,000.00 by the state of Florida for price-

---

[2] *See William Alan Davis et. al. v. HCA Healthcare, Inc.*, NC Sup. Ct. No. 21CV03276 (2021).

fixing/anti-competitive practices[3] resulting from HCA's implementation of a scheme to control the allocation of geographic and product markets for the acute care hospital marked in Collier County, Florida.  Additionally, HCA was the focus of the largest health care fraud investigation in U.S. history and was directed to pay $1.7 billion in penalties and damages.  HCA's fine was a result of the U.S. Justice Department's investigation[4] finding that HCA engaged in unlawful practices such as cost report fraud to Medicare and Medicaid and the payment of kickbacks to physicians.

32.   From HCA's perspective, the scheme being implemented here (and around the country) works extremely well as it enables HCA to successfully 1) divert patients to the Hospital, 2) assume control over the Sarasota orthopedic surgery market by removing the largest and most profitable surgical practices from the area market, 3) manipulate the recruitment of the most accomplished doctors, nurses, and staff from competing surgery practices to assume the market share in the area, and 4) deter the dissolution of the Partnership through the threat of reducing Partnership unit values to practically no value at the time of buyback from Plaintiff; and 5) deter future competition by implementing a two-year non-competition agreement that prevents *twelve doctors* from establishing

---

[3] *See Florida ex rel. Crist v. HCA, Inc.,* 2002 WL 32116840 (M.D.Fla. April 23, 2002).
[4] *See Department of Justice News Release,* June 26, 2003:
https://www.justice.gov/archive/opa/pr/2003/June/03_civ_386.htm.

competing surgery centers.

33.    If allowed to continue, HCA's anti-competitive conduct will ensure HCA unlawfully obtains control of patients' choice of medical care and the orthopedic surgical market share in the Sarasota area through its attempt to remove competitors and force patients to use HCA via the consolidation of facilities providing orthopedic surgery.

34.    HCA's scheme is carried out through the application of unreasonable restraints of trade and HCA's intentional refusal to honor its contractual commitment and fiduciary duty to properly operate and maintain the Surgery Center.  This scheme leaves doctors with no choice but to leave the Surgery Center, sell their ownership units back to HCA at an unreasonably reduced price, and abide by HCA's overbearing post-sale restrictive covenants.

35.    HCA is able to conduct this anti-competitive course of dealing through its sheer size and worldwide presence as one of the largest and powerful companies in the medical industry.  Because HCA is so big, it is easily able to manipulate vendor pricing, when and where patients can have surgeries performed, and control the market salaries of nurses and medical staff.

36.    By carrying out this scheme, HCA is directly restraining patients' right to seek and obtain the medical assistance of their choice.

37.    HCA already initiated attempts to entice Plaintiff's doctors to conduct surgeries at other HCA-owned facilities and implemented the same scheme at surrounding surgery centers.

38.    HCA, through its ownership of the Hospital, as General Manager of the Partnership, Manager of the Surgery Center, and as owner/landlord of the leased space where the Surgery Center resides, takes advantage of its position in the Partnership with Plaintiff by controlling the scheduling of surgery time slots. HCA prohibits the Surgery Center from scheduling procedures during weekend and evening timeframes while permitting the Hospital (and other HCA-owned hospitals in the area) to offer these coveted surgery time slots.   Evening and weekend time slots are highly sought after by patients and the Surgery Center's inability to offer these time slots resulted in a loss of patients.

39.    HCA prevents the Surgery Center from offering competitive salaries for its nurses and techs while allowing the Hospital to do so.   HCA's manipulation of the disparity in compensation created a high turnover rate for staff at the Surgery Center.  Plaintiff routinely loses its nurses and techs to the Hospital due to the more lucrative compensation packages the Hospital offers. HCA's control of this market compensation ensures the Hospital maintains a stable and more experienced staff than the Surgery Center.  In turn, the overall efficiency of the service at the Surgery Center suffers, which resulted in the

diversion of staff and patients to the Hospital.

40.     Because of HCA's failure to maintain a consistent staff at the Surgery Center, Plaintiff is often unable to schedule procedures when it has the capacity to do so at the Surgery Center.  The inability to schedule procedures is at the expense of the patient and adversely affects the efficiency, profitability, and reputation of Plaintiff's practice.

41.     HCA is deterring medical equipment and supply vendors from offering competitive pricing to Plaintiff.  As HCA is a multi-national, billion-dollar company, it leverages the threat of taking away lucrative contracts (nationally and worldwide) from vendors in order to prevent Plaintiff from obtaining the same competitive pricing that is given to the Hospital.

42.     HCA's anticompetitive conduct in conjunction with its drafting of the ARPA is designed to deter Plaintiff from dissolving the Partnership and returning to the competitive market.  Over the course of the Partnership, Plaintiff purchased Partnership units that are currently valued at several million dollars while HCA was supposed to improve the Surgery Center, by among other things, recruiting other surgical practices to the Surgery Center—HCA failed to recruit other medical practices as promised to Plaintiff.  HCA specifically left out any guidance in the ARPA regarding the sale of Partnership units in the event of a dissolution.  This omission by HCA is used to threaten the devaluation of units

to Plaintiff. HCA, due to its failure to recruit other medical practices to the Surgery Center, can now argue that the Partnership unit value will be reduced to nothing in the event of dissolution and/or litigation in order to prevent Plaintiff from leaving the Partnership.

43.    In conjunction with the threat of lost capital though diminished Partnership unit value, Plaintiff, which is comprised of twelve doctors, is prohibited from establishing other surgical centers for a two-year period—this ensures that HCA retains market power in the Sarasota area.

**b. The Contracts Executed by Plaintiff and HCA: The Amended and Restated Limited Partnership Agreement (ARPA) and Management Agreement**

44.    In 1995, Plaintiff and HCA executed a Limited Partnership Agreement to create Doctors Same Day Surgery Center, Ltd.

45.    On April 1, 2017, Plaintiff and HCA executed an Amendment and Restatement of Partnership Agreement ("ARPA"). **(See Exhibit "A")**

46.    Per Article III of the ARPA, the purpose of the Partnership includes but is not limited to the improvement, repair, maintenance, remodeling, lease, and the incorporation of business activities in support of the Surgery Center :

### ARTICLE III
### PURPOSE

The purposes of the Partnership are to: (1) own, operate, improve, repair, maintain, manage, sublease, replace, rebuild, alter, remodel, restore, sell, lease, mortgage, hypothecate and otherwise use and deal with the Center, including the Center Property and other property; (2) engage in any and all activities related or incident to the foregoing, including, without limitation, the acquisition, ownership, improvement, operation, sale, lease, sublease, mortgage or other use of or dealing with real, personal or mixed property; and (3) generally engage in such other business and activities and do any and all other acts that the General Partner deems necessary, appropriate or advisable from time to time in furtherance of and consistent with the Partnership's purposes.

47.     Article III also specifically states that the purpose of the Partnership is to engage in business activities and all other acts that the "General Partner deems necessary…in furtherance of and consistent with the Partnership's purposes."

48.     The ARPA also contains a non-competition agreement that prevents Plaintiff from owning or investing in another ambulatory surgery center within a twenty-five mile radius of the Surgery Center for a two-year duration.[5]

49.     The ARPA does not contain any guidance regarding the sale of Partnership units upon the dissolution of the Partnership.

50.     Contemporaneous with the execution of the ARPA, Plaintiff and HCA executed a Management Agreement for the Surgery Center. **(See Exhibit "B")** The Management Agreement details the management services provided in the operation of the Surgery Center and the duties of the Manager of the Surgery

---

[5] *See* Exhibit A, Article XIV, Section 14.1, pages 21-22.

Center.

51.     The Management Agreement dictates that HCA, as General Partner, also serves as the Manager of the Surgery Center.

52.     Per the Management Agreement[6], the duties of the Manager include but are not limited to the supervision of the day-to-day operations, materials management, and recruitment of personnel and medical staff for the benefit of the Surgery Center and Partnership:

> **1.    Management Services.**
>
> 1.1.    The Partnership hereby engages Manager, and Manager hereby accepts such engagement, to provide or arrange for day-to-day management services to and for the Surgery Center, including but not limited to financial management, preparation of the annual operating and capital budgets, purchasing, managed care contracting, materials management, reimbursement expertise, legal services, accreditation and risk management, public relations, preparation of staffing plans, recruitment of personnel and medical staff and supervision of the day-to-day operations of the Surgery Center.  In
>
> 1.5.    Manager shall undertake all of its obligations and duties hereunder for the account of the Partnership and not for the account of Manager,

## c. HCA's Breach of the ARPA and Management Agreement

53.     HCA breached ARPA through its anti-competitive conduct and its refusal, as the General Partner and Surgery Center Manager, to operate the Surgery Center as specifically required in these contracts.  Specifically, HCA breached Article III of the ARPA through its deliberate and blatant actions to serve the benefits of HCA and the Hospital in contravention of Article III and at the expense of Plaintiff and the Partnership.

---

[6] *Id.* at pages 1-2.

54.     HCA breached the Management Agreement through its anti-competitive conduct and its refusal, as Surgery Center Manager, to operate the Surgery Center as specifically required in these contracts.  Specifically, HCA breached Sections 1.1 of the Management Agreement through its refusal to properly operate the Surgery Center in accordance with the duties specifically detailed in Section 1.1.  HCA breached Section 1.5, through its abuse of its position and glaring conflict of interest as the Surgery Center owner and Manager, by actively serving the benefits of HCA and the Hospital instead of the Partnership.

55.     HCA breached the ARPA and Management Agreement by its implementation of the scheme to reduce the competitive power of the Surgery Center though the diminishment of the quality and capabilities of the Surgery Center.

56.     Since the inception of the Partnership, HCA failed to properly maintain and operate the Surgery Center and HCA frustrated the recruitment of quality staff to the Surgery Center by refusing to offer competitive compensation for the benefit of the Hospital.

57.     The end goal of HCA's scheme is to reduce the number of market participants, choices available to patients, and to ultimately control the orthopedic surgery market in the Sarasota area.  HCA will realize this goal

through its control of compensation for nurses and staff in this market, scheduling and availability for patients, deterioration of Plaintiff's and the Surgery Center's reputation and staff morale, and, finally, the diversion of patients, doctors, and staff to the Hospital.

58.    HCA enters into similar partnership agreements with the intent to control markets in other locales around the country.  To date, HCA failed to implement the 23-hour stay provision at the Surgery Center and the other three surgery centers HCA owns in the Sarasota area, while this has become the norm for ambulatory surgery centers.

59.    In 2019, the Florida State Legislature passed the healthcare-related House Bill (HB) 843, which directly impacted ambulatory surgery centers. Commonly referred to as the "23-hour stay", the bill amended Florida state healthcare statute 395.002 to allow patients to remain in an ambulatory surgery center for up to twenty-four hours (twenty-three hours and fifty-nine minutes). Previously, the law required that patients be admitted and discharged on the same day.

60.    The Florida legislature's new provision regarding the 23-hour stay gives ambulatory surgery centers and its surgeons the opportunity to perform higher-acuity procedures that have historically remained in hospital settings due to the required recovery time.  This rule change had a direct impact on

orthopedic surgical practices such as Plaintiff's in that the number of ambulatory surgery center-based spine surgeries and total joint replacements could now be performed on a more common basis.

61.    While the 23-hour stay has become the norm for ambulatory surgery centers, HCA, to date, failed to implement the 23-hour stay at the Surgery Center and the other three Sarasota area surgery centers that it owns.   Accordingly, patients requiring the procedures and recovery time discussed above are diverted to the Hospital (and HCA's other hospitals) for HCA's benefit and at patients' and Plaintiff's expense.

62.    HCA refuses to properly maintain the Surgery Center's heating, ventilation, and air conditioning (HVAC) system.   The HVAC system failures cause condensation to form on the floors of the operating rooms and hallways that are utilized by both patients and staff.   Additionally, the operating room temperatures cannot not be controlled while procedures are being performed, resulting in stagnant airflow affecting staff, doctors, and patients. Over the past several years, the HVAC system at the Surgery Center has repeatedly failed, preventing Plaintiff from using its operating rooms for an extended amount of time, thereby disrupting and limiting Surgery Center operations and preventing patients from obtaining care.

63.    The HVAC issue has been ongoing and despite multiple complaints

and requests by Plaintiff to HCA regarding the repeated system failures, HCA continues to do the bare minimum to resolve this situation.   HCA's refusal to properly resolve the HVAC system issue resulted in another system failure that occurred on December 17, 2021.   The system was completely disabled and forced Plaintiff to cancel all scheduled surgeries for the day.

64.    It is important to note that as the General Partner in the Partnership, Manager of the Surgery Center, and owner/landlord of the leased space where the Surgery Center resides, HCA represents both the landlord and tenant—itself.

65.     Being that HCA is the General Partner, Surgery Center Manager, and owner of the space where the Surgery Center resides, there is no incentive for HCA, in its capacity in any of the above stated roles, to perform its obligations under the lease, Partnership Agreement, or Management Agreement.

66.    HCA's role as the General Partner, Surgery Center Manager, and owner/landlord of the space where the Surgery Center resides presents a clear conflict of interest for HCA when it is supposed to negotiate repairs and improvements in a situation where the landlord and tenant are the same entity.

67.    Due to the glaring conflict of interest for HCA as landlord and tenant, Plaintiff (the Limited Partner) has absolutely no say or power to effectuate any repairs or improvements to the Surgery Center.

68.    HCA refuses to modernize the Surgery Center to accommodate the

changing needs of medicine, patients, physicians, and staff.  Since the Surgery Center's initial construction over sixteen years ago, HCA has not made any effort to modernize the facility.  At the same time, HCA-owned hospitals are continually modernized.  HCA's refusal to modernize the Surgery Center allowed the Hospital to effectively gain market share at Plaintiff's detriment.

69.   Aside from HCA's hindrance of the Surgery Center's efforts to modernize and improve its surgical capabilities, HCA refuses to address more basic issues such as the Surgery Center not having enough bathrooms to accommodate patients, doctors, and staff—Plaintiff's doctors and staff have to regularly leave the Surgery Center to use a bathroom.

70.   Plaintiff routinely made complaints to HCA regarding facility repairs, operational and equipment issues, and staffing problems with little to no response received.

71.   On January 13, 2021, Plaintiff submitted a written complaint to Gregary Beasley, President of Doctors Same Day Surgery Center, Inc. and employee of HCA, Inc., specifically detailing HCA's failure to properly operate and manage the Surgery Center and requesting the immediate resolution of these issues.  Beasley did not respond. **(See Exhibit "C")**

72.   On January 25, 2021, Melissa Egan, Senior Corporate Counsel for HCA, responded to Plaintiff's complaint with a terse denial of Plaintiff's claims

stating, "…many of the concerns identified in your correspondence contain factual inaccuracies or have been resolved."  Ms. Egan's dismissive statement is entirely untrue and, to date, HCA has not responded to any of Plaintiff's issues regarding HCA's failure to operate and manage the Surgery Center. **(See Exhibit "D")**

73.    Per Sections 9 and 9.2 of the Management Agreement, HCA's failure to perform its material obligations on its part under the Management Agreement for a period of thirty days after written notice thereof has been given to HCA constitutes a default of the Management Agreement.

74.    HCA breached the Management Agreement by not only failing to properly operate the Surgery Center, but by its failure to address the significant issues detailed by Plaintiff within the thirty-day period detailed in Section 9.2 of the Management Agreement[7]:

> **9.    Default and Termination**.  Each of the following will be an event of default ("Event of Default") hereunder:
>
> 9.2.    If Manager fails in the performance of any material obligation on its part required to be performed under this Agreement, and such failure continues for a period of 30 days after written notice thereof has been given to Manager; provided, however, that no Event of Default shall be deemed to have occurred with respect to a breach which cannot reasonably be cured within 30 days, so long as Manager commences to cure such breach within such 30 day period and thereafter prosecutes the same to conclusion with due diligence.

75.    The specific issues detailed in Plaintiff's January 13, 2021 correspondence to HCA remain unanswered and unresolved by HCA at the time

---

[7] *See* Exhibit B, Page 5.

of this pleading.

76.     Again, HCA's strategy is to wrongfully stifle competition and prevent *patients, doctors, staff, and medical practices* from engaging in a Florida marketplace that should be a free market unencumbered by the illegal, or in the alternative, inappropriate, anti-competitive efforts of a monopolistic organization such as HCA and its wholly owned subsidiaries.

77.     Despite the breaches discussed above, HCA continues to receive a management fee (6% of the average monthly net revenues of the Surgery Center)[8] and realizes profits earned by Plaintiff while HCA invests the bare minimum of time and capital into the operation of the Surgery Center.

## COUNT I
## Contract, Combination, or Conspiracy in Restraint of Trade
## in Violation of Section 1 of the Sherman Act, (15 U.S.C. § 1)

78.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

79.     HCA's efforts to frustrate the appropriate operation of Plaintiff's surgical practice and control the orthopedic surgical market in the Sarasota area through the Partnership's General Partner's efforts to conspire with the Hospital, its parent corporation, and medical supply vendors represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman

---

[8] *Id.* at Page 3.

Act.

80.     As a direct and proximate result of HCA's continuing violations of Section 1 of the Sherman Act, patients, Plaintiff, and the Sarasota orthopedic surgical market suffered and continue to suffer an antitrust injury resulting in damages in amount yet determined.

81.     HCA's actions resulted in reduced quality of care and availability of treatment for patients, reduced number of market participants, the deprivation of patients' benefits of their use of health care facilities, decreased surgeries performed at the Surgery Center, the diverting of patients to the Hospital due to capacity, staffing, and operational issues at the Surgery Center, a reduced pool of experienced nurses and surgery techs for the Surgery Center due to HCA's manipulation of market compensation, and the inability to obtain competitive pricing for medical equipment and supplies due to HCA's leverage on vendors.

82.     WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for damages, statutory and otherwise, together with attorneys' fees, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

## COUNT II
## Contract, Combination, or Conspiracy in Restraint of Trade
## in Violation of Section 1 of the Sherman Act with Regard to the ARPA
## (15 U.S.C. §1)

83.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

84.     HCA's efforts to frustrate the appropriate operation of Plaintiff's surgical practice and control the orthopedic surgical market in the Sarasota area through the Partnership's General Partner's efforts to conspire with the Hospital, its parent corporation, and medical supply vendors in conjunction with economic threats and the implementation of restrictive covenants, represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

85.     In 2017, HCA entered into the ARPA with Plaintiff with the intent to breach its contract and its fiduciary duties as General Partner to Plaintiff through the demonstrated anti-competitive conduct, to control patients' choice of medical care, to manipulate salaries in the Sarasota orthopedic surgery market, and to reduce of the number of market participants in the Sarasota area orthopedic surgery market.

86.     Regarding the sale of Partnership units, HCA specifically left out any guidance in the ARPA regarding the sale of Partnership units in the event of a dissolution.  This tactic is used to employ economic threats regarding the

devaluation of units to Plaintiff to prevent a dissolution, litigation, and to control the market place.

87.    Due to HCA's failure to recruit other medical practices to the Surgery Center as promised, Plaintiff is the primary source of income for the Surgery Center.   Accordingly, HCA threatens the severe devaluation of partnership unit value in the event of dissolution to prevent Plaintiff from leaving the Partnership.

88.    In conjunction with the threat of lost capital, Plaintiff, which is comprised of twelve doctors, is prohibited from establishing or having any type of ownership in other surgical centers for a two-year period—this ensures that HCA retains market power in the Sarasota area.

89.    When viewed in conjunction with HCA's scheme, the economic threats and restrictive covenants implemented by HCA present an insurmountable hurdle for Plaintiff to overcome.  Through its scheme, HCA is able to prevent twelve of the most reputable orthopedic surgeons (and Kennedy White Orthopedic Center) from participating in the Sarasota orthopedic surgical market.

90.    HCA's implementation of its scheme in conjunction with the aforementioned restrictive covenant ensures that Plaintiff, HCA's largest competitor in Sarasota, is held hostage by HCA and removed from the

orthopedic surgical market.

91.    As a direct and proximate result of HCA's continuing violations of Section 1 of the Sherman Act, patients, Plaintiff, and the Sarasota orthopedic surgical market suffered and continue to suffer an antitrust injury resulting in damages in amount yet determined.

92.    HCA's actions resulted in reduced quality of care and availability of treatment for patients, reduced number of market participants, the deprivation of patients' benefits of their use of health care facilities, decreased surgeries performed at the Surgery Center, the diverting of patients to the Hospital due to capacity, staffing, and operational issues at the Surgery Center, a reduced pool of experienced nurses and surgery techs for the Surgery Center due to HCA's manipulation of market compensation, and the inability to obtain competitive pricing for medical equipment and supplies due to HCA's leverage on vendors.

93.    HCA's anticompetitive conduct in conjunction with the ARPA is designed to deter Plaintiff from dissolving the Partnership and returning to the competitive market, which in turn, ensures 1) that the number of market participants has been reduced, and 2) HCA maintains control of patients' choice of medical care and the orthopedic surgical market share in the Sarasota area.

94.    WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for damages, statutory and otherwise, together with

attorneys' fees, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

## COUNT III
## Conspiracy to Monopolize in Violation of
## Section 2 of the Sherman Act (15 U.S.C. § 2)

95.    Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

96.    HCA's conduct violates Section 2 of the Sherman Act by its attempt to monopolize the orthopedic surgery market in the Sarasota area.

97.    HCA's conduct enables it to monopolize the market for orthopedic surgery service in the Sarasota area and stifle competition.  This will result in HCA being able to reduce the number of market participants, control the market share for orthopedic surgical practices, and exert significant control of the choice provided to insurance companies, Medicare and Medicaid plans, referring doctors, and patients as to where to access orthopedic services.

98.    As a direct and proximate result of HCA's continuing violations of Section 2 of the Sherman Act, patients, Plaintiff, and the Sarasota orthopedic surgical market suffered and continue to suffer an antitrust injury resulting in damages in amount yet determined.

99.    HCA's actions resulted in reduced quality of care and availability of treatment for patients, decreased surgeries performed at the Surgery Center,

having patients diverted to the Hospital due to capacity, staffing, and operational issues at the Surgery Center, a reduced pool of experienced nurses and surgery techs due to HCA's manipulation of market compensation, and the inability to obtain competitive pricing for medical equipment and supplies due to HCA's leverage on vendors.

100.   WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for damages, statutory and otherwise, together with attorneys' fees, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

## COUNT IV
## Violation of Fla. Stat. § 542.18, *et.seq.*

101.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

102.   Under Florida's antitrust statute, Fla. Stat. §§ 542.18 and 542.19, HCA's actions are an inappropriate restraint of trade.

103.   The above-cited Florida Statutes preventing the inappropriate restraint of trade are patterned after Section I of the Sherman Antitrust Act and has as its purpose to complement the body of federal law prohibiting restraints of trade or commerce in order to foster effective competition.

104.    A *per se* violation is one which requires no proof of anti-competitive effect and is limited to practices which are presumed to affect the market such as price-fixing, group boycotts, and customer allocations.

105.    *Per se* antitrust violations may be established with relatively little proof and the unlawful effect of the conduct is presumed.

106.    HCA's actions affect the quality of care and availability of treatment for patients, the allocation of patients to Plaintiff, prevents Plaintiff from hiring experienced nurses and surgical technicians through its manipulation of market compensation, prevents Plaintiff from obtaining competitive pricing on surgical equipment and supplies, and prevents Plaintiff from operating at capacity due to staffing, facility, and operational issues.  These restraints applied by HCA are not only anti-competitive, but directly impede the patient's right to choose when and where they can have medical procedures performed.    Accordingly, HCA's actions constitute *per se* violations of Fla. Stat. §§ 542.18 and 542.19.

107.    This scheme, which is being utilized by a corporation with a U.S. and European presence as large as HCA (especially when combined with its various subsidiaries) in Florida, constitute *per se* anti-competitive efforts that directly violate Fla. Stat. §§ 542.18 and 542.19 and is an attempt to monopolize the Sarasota orthopedic surgery market by preventing fair competition in the orthopedic surgery market, restricting patients' ability to use the medical practice

of their choice, and from preventing Plaintiff's ability to hire the staff of its choice due to the manipulation of marketplace compensation. These anti-competitive activities have already resulted in the reduction of patients' choices for orthopedic care, thus causing market-wide damage.

108. HCA's tactics have an anti-competitive effect on the marketplace. HCA seeks to control a specifically defined surgical market, possess the ability to affect price of equipment and supplies, and has further excluded Plaintiff from this market by preventing Plaintiff (as a result of HCA's actions) from hiring quality nurses, surgical techs, and staff for the Surgery Center.

109. Upon information and belief, HCA is employing the same scheme with other similarly situated medical practices around the country.

110. Plaintiff's exclusion from the orthopedic surgical market, via HCA's tactics mentioned above, has damaged Plaintiff and patients, as well as the entire orthopedic surgical services marketplace in the Sarasota area.

111. HCA's actions were intended to affect and did affect Plaintiff's (and all other similarly situated surgical practices) ability to operate in the orthopedic surgery market.

112. HCA's actions were intended to and did affect the availability of surgical services in the orthopedic surgery market.

113.    WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for treble damages as provided by statute, together with attorneys' fees, interest, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

## COUNT V
## Breach of Contract (ARPA)

114.    Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

115.    On April 12, 2017, Plaintiff and HCA executed an Amendment and Restatement of Partnership Agreement ("ARPA").

116.    HCA, through its anti-competitive conduct, materially breached the Article III of the ARPA with Plaintiff. HCA breached Article III of the ARPA through its deliberate and blatant actions to serve the benefits of HCA and the Hospital in contravention of Article III and at the expense of Plaintiff and the Partnership.

117.    HCA breached the ARPA by its implementation of the scheme to reduce the overall quality and efficiency of the Surgery Center for the benefit of the Hospital.

118.    HCA Breached the ARPA by prohibiting the Surgery Center from scheduling procedures at competitive time slots while allowing the same at the Hospital.

119.   HCA Breached the ARPA by frustrating the Surgery Center's employee recruitment through its manipulation of compensation rates for staff in favor of the Hospital.

120.   HCA Breached the ARPA by diverting patients, doctors, and employees to the Hospital by its continued refusal maintain an efficient, competitive, and modernized Surgery Center.

121.   HCA Breached the ARPA by deterring medical equipment and supply vendors from offering competitive pricing to Plaintiff.

122.   Plaintiff, as a direct and proximate result of HCA's material breaches of the Management Agreement, sustained damages related to its business and reputation due to its inability to recruit and maintain quality nurses and staff, operate in an efficient and modern surgical facility, and provide the same availability and care to patients as the Hospital and other competing surgery centers.

123.   WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for damages, statutory and otherwise, together with attorneys' fees, interest, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

## Count VI
## Breach of Contract (Management Agreement)

124.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

125.   On April 1, 2017, Plaintiff and HCA executed the Management Agreement.

126.   HCA, through its anti-competitive conduct, materially breached Sections 1.1 of the Management Agreement through its refusal to properly operate the Surgery Center in accordance with the duties specifically detailed in Section 1.1.

127.   HCA breached Section 1.5 of the Management Agreement through its abuse of its position and glaring conflict of interest as the Surgery Center owner and Manager, by actively serving the benefits of HCA and the Hospital instead of the Partnership.

128.   HCA breached Section 9.2 of the Management Agreement by its failure to address and resolve the significant maintenance, staff, and equipment issues detailed by Plaintiff in its January 13, 2021 demand letter to HCA within the thirty-day period detailed in the Management Agreement.

129.   HCA breached the Management Agreement by frustrating the Surgery Center's recruitment of nurses and staff through its manipulation of compensation rates for staff in favor of the Hospital.

130.   HCA breached the Management Agreement by its continued refusal maintain an efficient, competitive, and modernized Surgery Center.

131.   HCA breached the ARPA by deterring medical equipment and supply vendors from offering competitive pricing to Plaintiff.

132.   Plaintiff, as a direct and proximate result of HCA's material breaches of the Management Agreement, sustained damages related to its business and reputation due to its inability to operate an efficient and modernized surgical facility, recruit and maintain quality nurses and staff, and provide the same availability and care to patients as the Hospital and other competing surgery centers.

133.   WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for damages, statutory and otherwise, together with attorneys' fees, interest, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

## Count VII
## Breach of Fiduciary Duty

134.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

135.   Through the Partnership, Plaintiff placed its trust and confidence in HCA, as the General Partner and Surgery Center Manager, to support the

purpose of the Partnership that includes but is not limited to the operation, maintenance, and improvement of the Surgery Center.

136.   Plaintiff placed its trust and confidence in HCA as the General Partner and Surgery Center Manager, by allowing HCA to maintain total control over all decisions related to the support the purpose of the Partnership and Surgery Center.

137.   HCA's duties specifically entailed the management, operation, repair, leasing, recruitment and hiring of staff and doctors, modernization, and all related decisions and business activities in furtherance of and for the benefit of the Partnership and Surgery Center.

138.   HCA, acting as General Partner and Manager of the Surgery Center, breached its fiduciary duty to Plaintiff by its intentional implementation of the scheme to reduce the overall quality and efficiency of the Surgery Center for HCA's own benefit.

139.   HCA, through its anti-competitive conduct, breached its fiduciary duty to Plaintiff by frustrating the Surgery Center's recruitment of nurses and staff through the manipulation of market salaries for HCA's own benefit.

140.   HCA, through its anti-competitive conduct, breached its fiduciary duty to Plaintiff by preventing patients from choosing the surgery center of their

choice by intentionally restricting the Surgery Center's availability for surgical procedures.

141.  HCA, through its anti-competitive conduct, breached its fiduciary duty to Plaintiff by preventing patients from utilizing the Surgery Center by intentionally restricting the Surgery Center's capabilities for surgical procedures (HCA's failure to implement the 23-hour stay).

142.  HCA, through its anti-competitive conduct, breached its fiduciary duty to Plaintiff by deterring medical equipment and supply vendors from offering competitive pricing to Plaintiff.

143.  HCA, through its anti-competitive conduct, breached its fiduciary duty to Plaintiff by intentionally diverting patients, doctors, and employees to the Hospital by HCA's refusal maintain an efficient and modernized Surgery Center as required by contract.

144.  Plaintiff, as a direct and proximate result of HCA's breaches and anti-competitive conduct, sustained damages related to its business and reputation due to its inability to properly compete in the Sarasota orthopedic surgical market, operate an efficient and modernized surgical facility, recruit and maintain quality nurses and staff, and provide the same availability and care to patients as the Hospital and other competing surgery centers.

145.    WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for damages, statutory and otherwise, together with attorneys' fees, interest, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

## Count VIII
## Tortious Interference With Advantageous Business Relationship

146.    Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

147.    Plaintiff, through its medical practice, Kennedy White Orthopedic Center, developed substantial business relationships with doctors, patients, and medical equipment/supply vendors since its inception in 1975.

148.    Plaintiff's reputation, patients, relationships with vendors, and referral sources pre-date the Partnership with HCA.  The patients that utilize the Surgery Center are there solely because of their existing relationships and the reputation of the doctors of the Kennedy White Orthopedic Center.   HCA interfered with these relationships by intentionally degrading the quality and availability of the services provided by Plaintiff.

149.    HCA, upon entering into the Partnership with Plaintiff to own and operate the Surgery Center, was aware of the aforementioned existing relationships that Plaintiff cultivated with doctors, patients, medical staff, and vendors over the past several decades.

150.   HCA, through its anti-competitive conduct, intentionally and unjustifiably interfered with Plaintiff's doctor, patient, and vendor relationships.

151.   Plaintiff, as a direct and proximate result of HCA's interference, sustained damages related to its business and reputation.

152.   WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for damages, statutory and otherwise, together with attorneys' fees, interest, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

**Count IX**
**Fraud**

153.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 77 as though set forth herein.

154.   HCA required that it maintain a 51% interest in the Partnership and have absolute control over all decisions made for the Partnership.

155.   Plaintiff put trust and confidence in HCA, as the General Partner and Surgery Center Manager, to support the purpose of the Partnership through HCA's promise to, among many duties, manage the operation, maintenance, and improvement of the Surgery Center for the benefit of the Surgery Center[9].

156.   Upon the execution of the ARPA in 2017, HCA knew that its intent was to enter into this contract to hurt, not help, Plaintiff.

---

[9] *Supra* notes 2 and 6, pp. 14-15.

Case 8:22-cv-00150-VMC-TGW  Document 3  Filed 01/19/22  Page 44 of 46 PageID 48

157.   Upon the execution of the ARPA in 2017, HCA knew that its intent was to take advantage of its position as landowner, leaseholder, General Partner, and Surgery Center Manager for HCA's benefit.

158.   Upon the execution of the ARPA in 2017, HCA knew that its intent was to implement a scheme to gain control over the Sarasota area orthopedic surgical market.

159.   Plaintiff, as a direct and proximate result of HCA's actions, sustained damages related to its business and reputation due to its inability to properly compete in the Sarasota orthopedic surgical market, operate an efficient and modernized surgical facility, recruit and maintain quality nurses and staff, and provide the same availability and care to patients as the Hospital and other competing surgery centers that were not owned by HCA.

160.   WHEREFORE, Plaintiff respectfully demands that judgment be entered against HCA for damages, statutory and otherwise, together with attorneys' fees, interest, fines, penalties and costs, as well as any such other relief as the Court deems just and proper.

## **Request for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Order the dissolution of the Partnership;

B.   Declare the ARPA and Management agreements null and void;

C.  Declare that the non-competition and non-solicitation agreements contained in the ARPA are deemed invalid and unenforceable, thus allowing Plaintiff to immediately open, own, and operate other surgery centers within the twenty-five mile radius of the Surgery Center;

D.  Order that HCA purchase Plaintiffs remaining ownership units in the Partnership at fair market value;

E.  Order the disgorgement of all ill-gotten gains by HCA including but not limited to all management fees paid by Plaintiff to HCA from, at least, 2017 to present;

F.  Order HCA to reimburse Plaintiff's attorneys' fees and costs incurred in pursuit of this claim per 15 U.S.C. § 15, Fla. Stat. §§ 542.18 and 542.19;

G.  Award treble damages to Plaintiff per 15 U.S.C. § 15, Fla. Stat. §§ 542.18 and 542.19;

H.  Award punitive damages to Plaintiff per Fla. Stat. § 768.72; and

I.  Appropriately sanction HCA under Federal and State law for its implementation of its scheme. By implementing the scheme, HCA took measures to destroy Plaintiff's medical practice and control the orthopedic surgical market through its expansive facility ownership and presence in the medical industry via price-fixing and self-dealing at the expense of Plaintiff and its patients.

DATED:  January 18, 2022.

SHUMAKER, LOOP & KENDRICK, LLP
240 South Pineapple Avenue
Post Office Box 49948
Sarasota, Florida  34230-6948
(941)  366-6660
(941)  366-3999 (fax)
Primary: Rnichols@shumaker.com
Secondary:  Mtaaffe@shumaker.com
*Attorneys for Plaintiff*

By*:*   s/Ryan S. Nichols
      **Ryan S. Nichols, Esq.**
      Fla. Bar No. 89838
      Michael S. Taaffe, Esq.
      Florida Bar No.:   0490318